KESSLER et al. v. HERKLOTZ et al.

(Supreme Court, Appellate Division, First Department, November 23, 1906.)

PAYMENTS—RECOVERY—MISTAKE—EVIDENCE.

G. & Co. acted as defendants' Bremen agents to obtain speculative accounts from customers in Bremen, to be carried out through defendants in New York. As a matter of bookkeeping, all the transactions carried out for G. & Co.'s Bremen customers by defendants were charged to G. & Co. L. & Son, who were Bremen customers of G. & Co., being indebted to defendants through the latter for margins, at the request of G. & Co. cabled a request to plaintiffs to pay defendants $35,000 on account of G. & Co.

The payment was made, and plaintiffs immediately drew on L. & Son through plaintiffs' Bremen correspondent for the amount of the advancement. L. & Son having failed in the meantime, plaintiffs cabled G. & Co. that the payment had been made for their account, and on their denying the same, and claiming that the payment was for L. & Son, plaintiffs sought to recover the money from defendants. *Held*, that the cablegram directing the payment was ambiguous, and that plaintiffs were entitled to recover the money as money paid under a mistake of fact.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 39, Payment, §§ 272–281.]

Ingraham and Laughlin, JJ., dissenting.

Action by Alfred Kessler and others against John D. Herklotz and others to recover money alleged to have been paid under mistake. On motion to set aside verdict in favor of plaintiffs, and to dismiss the complaint, ordered to be heard in the first instance at the Appellate Division. Motion denied. Judgment for plaintiff.

Argued before PATTERSON, INGRAHAM, LAUGHLIN, HOUGHTON, and SCOTT, JJ.

George A. Strong, for the motion.
Howard Taylor, opposed.

HOUGHTON, J. The most difficult question involved in this case is the interpretation of the cablegram on which the plaintiffs paid the money to the defendants. The request to plaintiffs by Luermann & Sohn was to pay to defendants $35,000 "on account of Garbrecht & Co." which was done, and a receipt taken from defendants, stating that the payment was so made and received. If the cablegram must of necessity be construed as a request to pay the money for Luermann & Sohn and on their account and credit, irrespective of whose debt it liquidated or who had the benefit of it, then, manifestly, Luermann & Sohn alone are liable, and no cause of action exists against those defendants. If, on the other hand, as insisted by plaintiffs, the cablegram can be legitimately construed as a request by one foreign house to place this sum of money with defendant to the credit of Garbrecht & Co., another foreign house, presumptively upon authority and by direction of Garbrecht & Co., then, it seems to me, the plaintiffs proved a good cause of action.

I am inclined to adopt this latter interpretation. Both foreign houses were known to plaintiffs. They knew nothing of the dealings between the defendants and Garbrecht & Co., or between Garbrecht & Co. and Luermann & Sohn. Presumably Garbrecht & Co. had arranged with Luermann & Sohn to have deposited with defendants a sum upon which they could draw, or with which they could deal in the ordinary course of international business. This is the fair meaning of the direction to pay or place "for the account of Garbrecht & Co." If in fact Garbrecht & Co. had made no arrangements with Luermann & Sohn to so place the money to their credit with defendants, and had not authorized it to be done, then the plaintiffs paid over the money under a mistake. Garbrecht & Co. had not made any such arrangement, and had only demanded that Luermann & Sohn pay their own debt to the defendants. If Luermann & Sohn did not pay this debt, Garbrecht

& Co. under their guaranty must do so. Garbrecht & Co. have, therefore, had the benefit of the money paid by plaintiffs to defendants under a mistaken idea as to the situation, and the money has gone to lessen Garbrecht & Co.'s obligation to the defendants. If, therefore, the plaintiffs were justified in assuming from the cablegram that they were to pay over the money to defendants because Garbrecht & Co. had authorized Luermann & Sohn to have it done, the situation comes to this: that Garbrecht & Co. repudiate the acts of a person who plaintiffs had a right to assume was acting for them, and still insist, through defendants, upon keeping the fruits of his unauthorized act.

Unless defendants have the right to keep the money because it was paid on a debt due from Luermann & Sohn to them, they are a mere depositary for the benefit of Garbrecht & Co.; and, so far as plaintiffs are concerned, that relation is not changed by the fact that Garbrecht & Co. were their contingent debtors and liable for the debt if Luermann & Sohn did not pay. Occupying this position, defendants' rights are dependent on the attitude of Garbrecht & Co. That attitude is that they gave no authority to Luermann & Sohn to pay the money on any such account or state of facts as plaintiffs were authorized to believe that the cablegram directed to be done. They cannot repudiate the authority which brought the money to them and still keep the money. It is no answer to say that there was no mistake on the part of the defendants and Garbrecht & Co., and that they fully understood how the money was paid. Accepting the money when no authority existed for its payment, or keeping it after repudiation of the authority under which plaintiffs were justified in believing it was paid, is a fraud; and mistake on one side and fraud on the other is sufficient ground for recovery back.

The situation is not one where money is obtained by false pretenses or theft and paid over by the thief to his innocent creditor. The harsh rule of law with respect to stolen money, adopted from necessity, because money cannot be traced, and to insure stability in business transactions, does not apply. None of the parties to the transaction committed a larceny of the money, and neither Garbrecht & Co. nor Luermann & Sohn ever obtained actual possession of it and then paid it over to defendants on their debt. The transaction discloses a simple, commercial misapprehension and business mistake. The office which the money performed was to pay the ultimate debt of the guarantors, Garbrecht & Co. So far as plaintiffs are concerned it is a mere question of payment under mistaken authority, and Garbrecht & Co. must acknowledge that it was done by their authority or else be deprived of the accruing benefit. The position of defendants has not been changed, for they still have the guaranty of Garbrecht & Co. if they are compelled to refund the money to plaintiffs.

I think the exceptions should be overruled, and judgment directed in favor of plaintiffs.

SCOTT, J., concurs.

PATTERSON, J. (concurring). I am of the opinion that the exceptions of the defendants to the ruling of the trial court in directing

a verdict for the plaintiffs in this action should be overruled. Equity and good conscience require that the money of the plaintiffs in the hands of the defendants should be restored to the real owner. It is indisputable that $35,000 of the plaintiffs' money, which they believed they were depositing with the defendants for the sole use and benefit of one Garbrecht, were appropriated by the defendants to their own use and to keep alive a speculative account of one Lurman, a resident of Bremen, in Germany, who was operating in the New York market through the defendants' agent, Garbrecht, also a resident of Bremen. That Garbrecht was the defendants' agent cannot be doubted. The agency began as early as 1883, and was in existence at the time of the transaction out of which this action arose. It is also not to be denied that, when the plaintiffs paid the money into the hands of the defendants, they were ignorant of any relations existing between Lurman and the defendants. The transaction was initiated by a cable dispatch from Lurman to the plaintiffs, by which they were requested by Lurman to pay to the defendants $35,000, "for account of Garbrecht." They believed, and had every reason to believe, that this was only a telegraphic transfer of money to be paid in to the defendants for the use of Garbrecht; and the defendants admit in their answer that they received the money for the account of Garbrecht. I think it is plain that the plaintiffs intended to deposit with the defendants a sum of money available only to Garbrecht; for there was nothing to indicate to them that, instead of making a deposit of that character, they were discharging an obligation arising out of the speculations of Lurman, carried on by the defendants, and with which the plaintiffs were in no way concerned or interested. That Lurman was a customer of the defendants, and not of Garbrecht, amply appears. Garbrecht was the agent of the defendants to solicit business for them in Bremen. On or about the 5th of February, 1904, several customers of the defendants in Bremen, among whom was Lurman, were in default on margins. Garbrecht was notified of the fact. The largest of those in default was Lurman. Garbrecht called upon him to remit $35,000 to the defendants. The whole amount Garbrecht was required by the defendants to collect was $43,-000, and $35,000 of that amount represented the sum due from Lurman. On the day last named Garbrecht notified Lurman of the state of his ventures with Herklotz, Corn & Co., and asked him to make a cable remittance that morning to the defendants of $35,000 "on account of the margins due from you." Lurman informed Garbrecht that the payment had been made, and he likewise received confirmation to that effect from the defendants, viz., that the payment demanded from Lurman had been made; but of this correspondence the plaintiffs apparently were in ignorance.

It may be true that Herkoltz, Corn & Co. did not know the names of the customers they had in Bremen, and who were procured through the agency of Garbrecht; but they did know that they received the plaintiffs' money to feed the speculative accounts of customers so procured for them by their Bremen agent, and when they received the plaintiffs' money no disclosure was made of the facts, nor any intimation given, so far as the record shows, that they were accepting it otherwise

than as so much money paid into their hands simply and solely for the personal account of Garbrecht. It will not do to say that their receipt of the money for Garbrecht's "account" was literally true. In their system of bookkeeping and by agreement with Garbrecht the speculative accounts procured by the latter were kept by the defendants in his name. That was for convenience and as a method of simplifying accounts. It cannot be assumed that, when the plaintiffs paid in the money "for account of Garbrecht," they could have had in mind an account of Garbrecht as agent of the defendants. Garbrecht, it is true, guarantied the collection of all amounts that might be owing to the defendants from Bremen customers procured by him for the defendants; but there is nothing to indicate that those customers were not the principal debtors of the defendants, nor is there anything to show that the plaintiffs could have surmised that their moneys were to be appropriated by the defendants and put to the credit of Garbrecht in such an account as was kept in his name by the plaintiffs, or, in other words, were to be paid to the defendants to be retained as their own. As matter of fact, Garbrecht never intended that the plaintiffs' money should be paid in for his account. He washed his hands of the whole transaction. When he was asked by the plaintiffs to confirm the payment made by them to the defendants on his account, his answer to them by cable was, "Not our, but Lurman's account." And it is obvious that he meant the payment to be made for Lurman, and not for himself. He evidently saw that he might be responsible for the reimbursement to the plaintiffs of this sum of money, and therefore he repudiated the transaction. In such circumstances, I think it is only just, reasonable, and equitable that the plaintiffs should recover their money back.

If my views, as so far expressed, are not sufficient to sustain a recovery by the plaintiffs, then there is another aspect in which the case may be viewed, and which justifies such recovery. The defendants insist that Garbrecht was their debtor, that the payment was made on his account unreservedly and unconditionally, and that it was so accepted and that there the transaction ended. If that be so, then it is proven that Garbrecht disclaimed and disavowed the relation imputed to him to the transaction, and did not authorize the payment to be made on his account, and would not adopt it. The plaintiffs were misled by Lurman's cable message, and paid the money to the defendants through mistake. Such being the fact, the plaintiffs are entitled to recover back the money, unless the defendants have been put in such a position that they would sustain damage if they were required to make restitution, of which there is no evidence whatever. From all that appears, they still have their claim and right of action against Garbrecht. Clearly they paid the money under a mistake of fact, and the well-settled rule that money so paid may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of the other party that it would be inequitable to require him to refund, which has recently been reannounced in Hathaway v. County of Delaware, 185 N. Y. 368, 78 N. E. 153, is applicable to and should be enforced in this action.

The exceptions should be overruled, and judgment upon the verdict entered for the plaintiffs, with costs.

INGRAHAM, J. (dissenting). In this action, at the end of the plaintiffs' case, the defendants moved to dismiss the complaint, this motion was denied, and the defendants excepted. The defendants then rested, and the plaintiffs moved to direct a verdict in their favor, which motion was granted, and to that defendants excepted. There were no requests to submit any question to the jury, and the court thereupon ordered the exceptions to be heard in the first instance by this court. The question thus submitted to the Trial Term, and which is before us on this appeal, is whether the plaintiffs, on the testimony presented, were entitled to a verdict.

There is no substantial dispute as to the facts which are as follows: The plaintiffs are bankers, and the defendants brokers, doing business in the city of New York. There was a firm of bankers in Bremen doing business under the name of St. Luermann & Sohn, and there was also a firm doing business in Bremen under the name of F. Garbrecht & Co. Garbrecht had acted for many years as the agent for the defendants, transmitting them orders from customers in Germany for the purchase and sale of coffee, cotton, and cereals, for which transactions Garbrecht & Co. received return commissions. Garbrecht & Co. were authorized by defendants to—

"Make up statements [settlements] in our name on the orders given to us by their intermediary, and, in the event of any balance in our favor appearing, to cash the same and give receipt for the same in our name. Furthermore, * * * whenever any margins [differences] are outstanding on pending transactions, to call for same and collect them for us."

The arrangement under which the business between the defendants and Garbrecht was done was testified to by Garbrecht as follows:

"I guaranty to Herklotz [the defendants] the collection of such claims that result from business transacted with customers introduced by me. This agreement has been in existence for more than 20 years, and is confirmed by the correspondence exchanged in the meantime, and by the way the business is handled."

Prior to February 5, 1904, Luermann & Sohn had had business transactions with the defendants, which were transacted through Garbrecht, and on February 4, 1904, there was a deficit balance due from Luermann & Sohn of upwards of $37,000, which, under the arrangement between the defendants and Garbrecht, were charged on defendants' books to Garbrecht. On the 4th day of February, Garbrecht demanded of Luermann & Sohn that they make a cable remittance of $35,000 to the defendants on account of margins due from Luermann & Sohn. This demand does not seem to have been complied with, and on February 5, 1904, there seems to have been due from Luermann & Sohn to the defendants $37,000. On that day Garbrecht demanded of Luermann & Sohn that they make a cable remittance to the defendants of $35,000 on account of the margins due from Luermann & Sohn to the defendants. After this demand Luermann & Sohn cabled to the plaintiffs to pay to the defendants $35,000 for account of Gar-

brecht. The relations existing between the plaintiffs and Luermann & Sohn, as testified to by one of the plaintiffs, were:

"The only business we had with Luermann was that they bought some bonds and stocks through us once, and we were carrying them for them through drawing long bills of exchange. That was renewed two or three times."

The plaintiffs never had any transactions with Garbrecht, except prior to that time, when they had a balance of Luermann & Sohn in their hands, they had made payments on Luermann's request to the defendants to the account of Garbrecht, and all that the plaintiffs knew of the relation between Luermann and Garbrecht was that they had business relations. Upon receipt of this cable from Luermann & Sohn, the plaintiffs paid to the defendants $35,000, stating to them that it was for the account of Garbrecht, and the defendants stating that it was received for the account of Garbrecht. On the same day the plaintiffs made an entry in their ledger charging to Luermann & Sohn, "To payment, Herklotz, Corn & Co., $35,000," and this entry was made in consequence of the telegram they had received from Luermann & Sohn to make the payment of the money to the defendants. On the same day they wrote a letter to the Bremer Filiaale Der Deutschen Bank of Bremen, advising them that they had instructed Messrs. St. Luermann & Sohn, Bremen, to pay to that bank for plaintiffs' account the sum of 317,040.95 Reichmark, three days after the receipt of that letter, and at the same time instructed Luermann & Sohn to pay that amount to the bank for the plaintiffs' account. Nothing else appears to have been done until the 9th day of February, when the plaintiffs were informed that Luermann & Sohn had failed, whereupon, on the 10th day of February, plaintiffs cabled to Garbrecht as follows:

"Paid Herklotz, Corn & Co. $35,000 fifth February for your account, as per instructions from Luermanns; please confirm by cable; our expense."

To that Garbrecht replied by cable on the same day:

"Not our but Luermann's account."

Whereupon the plaintiffs demanded from the defendants the return of the $35,000, which was refused, and they brought this action.

The action is in the form of an action for money had and received. There was no promise of the defendants to repay this money, as it was not paid as a loan to the defendants. Garbrecht had with the defendants an account on which there was due to the defendants $35,000, for which Garbrecht was liable. The payment was received by the defendants without notice of any kind that the transaction was other than the ordinary transaction by which Garbrecht's indebtedness to the defendants was to that extent satisfied. There was no mistake of fact on the defendants' part as to the intention with which the money was paid, and I assume that no supposition indulged in by the plaintiffs would justify them in demanding a return of the money so long as there was no mutual mistake of fact in relation to the payment and no fraud practiced by the defendants or persons representing them, or for whose representations or statements the defendants were re-

sponsible. The question, therefore, is whether upon these facts the plaintiffs in equity and good conscience were entitled to have this money repaid to them.

The nature of an action for money had and received is stated in Roberts v. Ely, 113 N. Y. 128, 20 N. E. 606:

"The action for money had and received to the use of another is in the form in which the courts of common law enforce the equitable obligation. The scope of this remedy has been gradually extended to embrace many cases which were originally cognizable only in the courts of equity. Whenever one person has in his possession money which he cannot conscientiously retain from another, the latter may recover it in this form of action, subject to the restriction that the mode of trial and the relief which can be given in a legal action are adopted to the exigencies of the particular case. * * * The right on the one side, and the correlative duty on the other, create the necessary privity and justify the implication of a promise by the defendant to do that which justice and equity require. It is immaterial, also, whether the original possession of the money by the defendant was rightful or wrongful. It is sufficient that the duty exists on his part, created by the circumstances, to account for and pay it over to the plaintiff."

In Hathaway v. County of Delaware, 185 N. Y. 368, 78 N. E. 153, one Woodruff was the county treasurer of Delaware county prior to January 1, 1900, and he appropriated the county money to his own use. On January 1, 1900, he was succeeded as county treasurer by one Adair. About May 1, 1900, Adair discovered that Woodruff was indebted to the county and demanded payment of the debt. Thereupon Adair presented to the plaintiffs what purported to be a note of the county of Delaware and to be executed by Adair, its treasurer, for the sum of $5,000. The signature of Adair to this note was forged by Woodruff. On the presentation of the forged note referred to, Woodruff represented that he was obtaining the loan for the county, and the plaintiffs thereupon drew their check to the order of Adair, county treasurer of Delaware county, and delivered it to Woodruff for transmission to the county treasurer. Woodruff turned the check over to Adair on account of his personal indebtedness, and it was received by Adair as a payment on that account. The money was collected and went into the treasury of Delaware county. The plaintiffs, on discovering the forgery, demanded the return of the money, which being refused, they brought an action, in which they obtained a judgment, which was affirmed by the Court of Appeals. In the discussion of the question there presented, the court said:

"Plaintiffs sought to recover this money as paid under a mistake of fact. The rule as to such payment is thoroughly settled in this state. 'Money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of the other party that it would be unjust to require him to refund. * * * If circumstances exist which make such recovery inequitable, the burden of proving that fact rests upon the party resisting the payment. * * * Generally, in actions of this kind, the mistake under which the money is paid is a mutual one as to the existence or the nonexistence of a fact which justifies or requires the payment. It is not essential, however, that the mistake should be of that character.' "

The court then, after citing several cases of the Court of Appeals, of which the latest were Goshen Nat. Bank v. State of N. Y., 141 N. Y.

379, 36 N. E. 316, and Nassau Bank v. Bank of Newburgh, 159 N. Y. 456, 54 N. E. 66, says:

"The crucial distinction between those cases and the present one lies here. There was an earmark on the money which the defendant received, and the plaintiffs' check was diverted, in that, while it was given as a loan to the defendant, it was used to pay Woodruff's debt. Had the plaintiffs given Woodruff money, and the defendants received it in good faith, without knowledge how it was obtained, doubtless the plaintiffs could not recover. I assume that, if they had given a check to Woodruff's order, the money could not be reclaimed after payment, even if plaintiffs could have successfully resisted an action brought on the check. * * * But that is not the present case. The check was drawn by the plaintiffs to the order of the defendants. It imported on its face that the money represented by it was the property of the plaintiffs, and that they, and not Woodruff, were paying it to the defendant."

And the question is whether this case falls within the principles announced in Roberts v. Ely, supra, Hathaway v. County of Delaware, supra, or within Goshen Nat. Bank v. State of N. Y., supra, and Nassau Bank v. Nat. Bank of Newburgh, supra. In the Goshen Bank Case, it appeared that one Murray was the county treasurer of Orange county. He received the taxes collected from that county for state purposes in January and February, 1892, and neglected to pay over the amount thereof at the time fixed by the law. The Comptroller of the state had demanded the balance due from him, which amounted to the sum of $2,567.37. At the time of this demand, and for 10 years prior thereto, Murray had been cashier for the plaintiff bank. For the purpose of paying such taxes, Murray took a blank draft, addressed to the Importers' & Traders' National Bank in the city of New York, filled it up for the above amount, and signed his name as cashier. The bank had funds in the New York bank on which the draft was drawn. Murray then forwarded the check to the Comptroller as payment for such taxes. The Comptroller received the draft, indorsed it as payable to the State Treasurer, and he collected it. When Murray drew and signed this draft, he paid no money to the claimant and made no entry upon its books showing the drawing of the draft. He had no money to his credit in the bank, and was largely insolvent and largely in debt to the bank at that time, and shortly after absconded. None of the other officers had any knowledge of the drawing of the check, and the fact was not discovered until after he had absconded. In discussing the liability of the state to refund the bank this money, the court said:

"If the cashier, instead of sending this draft, had taken the money directly from the bank and paid the same to the state in satisfaction for the amount due for the taxes, I think no one would contend that the bank could recover it back from the state on the ground that the act of the cashier in taking the money was a fraud upon it, or even a felony, and that the state had parted with no value at the time of the receipt of the money. I do not see that in this respect the case is altered by the interposition of the draft, instead of the payment of the money in the first instance. The state received in good faith (as we must assume on this point) the written direction of the claimant to a third party to pay the money to the state upon demand, and the state makes the demand accordingly, and the money is paid, and the debt is extinguished. * * * In this case the state was no wrongdoer, and in forwarding the draft for payment and receiving the money upon such payment, it committed no wrong, was guilty of no conversion, and created no cause of action against it for the recovery of the money it thus received."

In Nassau Bank v. Bank of Newburgh, supra, one Taylor had deposited with the plaintiff a draft for $6,000 to the order of one Currie. The indorsement on the check had been forged by Taylor. The defendant received this draft for Taylor's account, and subsequently paid out on Taylor's checks all the amount that it had received. One of the checks of the plaintiff's bank for the sum of $2,400 was deposited with the defendant and collected by it, and was still in its possession at the time the action was commenced. Whereupon the plaintiff sued the defendant bank to recover back this $2,400 as the plaintiff's money had and received. The court, in affirming the judgment in favor of the defendant, said:

"The situation may be said to be, in certain respects, new; but I see no good reason for denying to it the application of the rule that when money has been received by a person in good faith, in the usual course of business, and for a valuable consideration, it cannot be pursued into his hands by one from whom it has been obtained through the fraud of a third person. If it has been used, as it is claimed in the present case, to pay an indebtedness owing by the third person, with innocence in the recipient, there is a consideration for its payment by him, which, despite the fraud through which the money was obtained, and for reasons based upon policy and the need for such security in ordinary commercial transactions, supports and protects its possession against the world. ❊ ❊ ❊ Taylor was a debtor by reason of his forgeries, as well to those who were injured in their property rights thereby as to the law for his criminal acts, and it is of no conceivable importance, in my opinion, that the existence of the fact of indebtedness should be unknown at the time he sought to make reparation by repaying the moneys feloniously taken."

It seems to me that this case clearly falls within the principle established in the last cases cited. Luermann & Sohn and Garbrecht were indebted to the defendants. Defendants had demanded payment of such indebtedness, and to comply with that demand the debtors requested the plaintiffs to pay a sum of money to the defendants. In compliance with that request, the plaintiffs paid a sum of money, which was received by the defendants on account of the person for whose account the money was paid. There was nothing inequitable in the defendants' accepting this money for the account of Garbrecht and applying it to the reduction of his indebtedness. The transaction was not in any sense a loan of money to the defendants, and whether it was paid by Luermann to settle his indebtedness to Garbrecht, and received by Garbrecht and paid to the defendants as settlement of Garbrecht's indebtedness to them, there was an outstanding indebtedness of either Garbrecht or Luermann or both to the defendants, and the money was received by the defendants in settlement of that indebtedness, without the slightest knowledge or notice, express or implied, that there was any mistake or misunderstanding in the transaction, or that the transaction was not what it purported to be on its face, viz., a payment on account of Luermann or Garbrecht of an indebtedness to the defendants. And, even if the plaintiffs had been induced by fraud to thus pay Garbrecht's or Luermann's indebtedness to the defendants, in the absence of any notice to the defendants of the fraud, or notice of any fact sufficient to put the defendants on inquiry as to the sources from which the money came, I think that the plaintiffs would not be en-

titled to recover the money back, under the rule stated in Nassau Bank v. Bank of Newburgh, supra.

But I cannot see from this record that there was any evidence of fraud or deceit practiced on these plaintiffs, or that the money was paid by the plaintiffs to the defendants under a mistake of fact. The money was paid at the request of Luermann & Sohn, it was charged to Luermann & Sohn on the plaintiffs' books, and Luermann was requested by the plaintiffs to pay it to the plaintiffs' correspondents at Bremen. The telegram under which the payment was made was a simple request to the plaintiffs to pay to the defendants a sum of money. There was no mistake of fact, nor fraud or deceit. What the plaintiffs assumed as to the relations between Luermann and Garbrecht, seems to me to be entirely immaterial. There was nothing in the telegram to justify any assumption, except that Luermann and Sohn desired the plaintiffs to make a payment for them to the defendants for Garbrecht's account. That Luermann would be responsible to the plaintiffs for that sum thus paid must be conceded. But there is certainly nothing in the transaction, so far as appears, that justifies an assumption that there was anything more than a loan of money for Luermann's account; and it was thus treated by the plaintiffs in charging that amount to Luermann & Sohn, and requesting him to repay it to the plaintiffs' correspondent in Bremen. There is no evidence as to how this payment to the defendants was made, the allegation being that the plaintiffs paid to these defendants a sum of money which the defendants received for the account of Garbrecht; and that allegation is admitted by the defendants. So it must be assumed that the money was paid as money, and received by the defendants as money, and was applied by the defendants on the account to the credit of which it was paid, and when that money was paid there was due from the person for whose account it was paid the amount paid. There was thus presented the exact situation pointed out by Judge Gray in Nassau Bank v. Bank of Newburgh, supra:

"When money has been received by a person in good faith, in the usual course of business, and for a valuable consideration, it cannot be pursued into his hands by one from whom it has been obtained through the fraud of a third person. If it has been used, as it is claimed in this case, to pay an indebtedness owing by a third person, with the innocence in the recipient, there is a consideration for its payment by him, which, despite the fraud through which the money was obtained, and for reasons based upon policy and the need for such security in ordinary commercial transactions, supports and protects its possession against the world."

And by Chief Judge Cullen in Hathaway v. County of Delaware, supra:

"Had the plaintiff given Woodruff and the defendant received it in good faith, without knowledge how it was obtained, doubtless the plaintiff could not recover. I assume that, if he had given a check to Woodruff's order, the money could not be reclaimed after payment, even if plaintiff could have successfully resisted an action brought on the check."

It follows that the exceptions should be sustained, and a new trial ordered, with costs to defendants to abide the event.

LAUGHLIN, J., concurs.